**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JUN 21 2004**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

MICHAEL TAPIA,

       Plaintiff-Appellant,

v.

CITY OF ALBUQUERQUE, and
CORRECTIONS OFFICER JASON
GARCIA AND CORRECTIONS
OFFICER JIMMY PINON, in their
individual and official capacities as
employees of the CITY OF
ALBUQUERQUE,

       Defendants-Appellees.

No. 03-2133
(D.C. No. CIV-02-695)
(D. New Mexico)

**ORDER AND JUDGMENT**[*]

Before **TYMKOVICH**, Circuit Judge, **McWILLIAMS**, Senior Circuit Judge, and **PORFILIO**, Senior Circuit Judge.

On March 19, 2003, Michael Tapia ("Tapia") filed a first amended

complaint in the United States District Court for the District of New Mexico

against the City of Albuquerque ("City") and Jason Garcia ("Garcia") and Jimmy

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

Pinon ("Pinon"), the latter two in their individual and official capacities as guards at the Bernalillo County Detention Center ("BCDC"). Tapia claimed that, as a result of Garcia's and Pinon's negligence, battery and excessive use of force, he sustained damages caused by injuries inflicted upon him by the two of them while booking him into the BCDC. After setting forth the "facts" out of which this litigation arises, Tapia alleged two claims based on the New Mexico Tort Claims Act. Count 1 was against the City and Garcia and Pinon for "Tort-Battery." Count 2 was also under the New Mexico Tort Claims Act and was against the City only. It was based on the City's "Negligent Operation" of the BCDC. Count 3, the only count we are concerned with in this appeal, was against Garcia and Pinon only for using excessive force in violation of the Fourth Amendment and 42 U.S.C. §§ 1983 and 1988.

Tapia's original complaint was filed on June 17, 2002, naming the City and John Does I through VI as defendants. On March 14, 2003, the district court granted Tapia's unopposed motion to file an amended complaint. On March 13, 2003, counsel for the City, Garcia and Pinon filed a motion for summary judgment, apparently in anticipation of the claims to be later presented in Tapia's first amended complaint, which, as of that date, had not been filed. Be that as it may, six days later, on March 19, 2003, Tapia filed his first amended complaint, naming as defendants the City, Garcia and Pinon. Tapia filed a response to

2

defendants' motion for summary judgment on March 31, 2003. On June 9, 2003, the district court granted Garcia and Pinon's motion for summary judgment on the grounds that on the showing made there was no objectively unreasonable search or seizure because of a use of "excessive" force. Accordingly, the district court dismissed Tapia's § 1983 claim (Count 3), against Garcia and Pinon, and entered judgment "dismissing plaintiff's federal claims with prejudice." Tapia appeals. As to Tapia's state claims set forth in Counts 1 and 2, the district court dismissed those claims, without prejudice, and they are not involved in this appeal.

There was considerable evidentiary matter before the district court when it granted defendants' motion for summary judgment on Count 3, which apparently included the depositions of virtually all interested persons. Additionally, there were videotapes of the events occurring at the BCDC when Tapia was "booked in." The government included in their motion for summary judgment a video (no audio), referred to as "video 1." On April 4, 2003, the government delivered to Tapia a second video (no audio), referred to as "video 2," which was supposedly a "clearer version" of video 1 and taken from a different angle. Tapia immediately filed with the district court video 2, as a part of his response to defendants' motion for summary judgment. As indicated, the district court thereafter granted the motion for summary judgment on June 9, 2003.

Although the amended complaint does not, itself, mention the Fourth

Amendment, and does mention the Fourteenth Amendment, it is apparently agreed that the first amended complaint is based on 42 U.S.C. § 1983, alleging a violation of Tapia's Fourth Amendment rights. The Fourth Amendment provides that "the right of the people to be secure in their persons, houses, papers, and effects, against <u>unreasonable</u> searches and seizures, shall not be violated . . . ." (Emphasis added.) In turn, 42 U.S.C. § 1983 reads, in part, as follows:

§ 1983. Civil action for deprivation of rights

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, . . . .

As indicated, as to Count 3 the defendants pleaded qualified immunity, and the district court ultimately held that the defendants were entitled to qualified immunity. In this general connection the Supreme Court, in *Harlow v. Fitzgerald,* 457 U.S. 800, 815 (1982) held that a claim of "qualified immunity would be defeated if an official 'knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the . . . [plaintiff], or if he took the action with the malicious intention to cause a deprivation of constitutional rights or other injury . . .'." As we

4

understand it, there is no contention here that either Garcia's or Pinon's actions were with a malicious intent, but counsel does complain that they "knew" or "should have known" that their actions in booking Tapia into the BCDC and placing him in a protective custody cell, violated Tapia's Fourth Amendment right to be free of an "unreasonable" search and seizure by virtue of their use of "excessive force."

Tapia had a history of mental problems and had threatened to commit suicide on more than one occasion. On November 29, 2001, Tapia, while at home, pretended to stab himself in the abdomen with a kitchen knife. His wife witnessed this incident and promptly called 911. While still on the phone and after summoning help, she realized that her husband was feigning, and she tried to cancel the call. However, by that time the paramedics were on their way. Tapia informed the responding officers, which included an Officer Kraemer of the Albuquerque police department, that he would like to hurt himself and that he wanted to die. For his own safety, the officers placed Tapia into protective custody, as permitted by local law, and took him to the University of New Mexico Mental Health Center. Tapia submitted to a blood-alcohol test which established his blood-alcohol level to be .096%. In this regard, Tapia admitted that he had consumed "a few beers." He was then informed by the hospital authorities that he could not be admitted or evaluated in their facility until his blood alcohol level

5

dropped below .05%. Accordingly, he was then taken by the officers, Kraemer and another, to the BCDC with the intent to place him in the BCDC until he sobered up.

Under jail policy, all persons brought to the jail must, under local law, be searched for weapons and contraband. Accordingly, Tapia was asked to come forward and place his hands on the "booking counter," spread his legs so he could be "frisked," and not to move until the process was completed.

Surveillance cameras recorded the events that occurred at the booking counter. The videotapes reveal that Tapia apparently began to argue with BCDC personnel almost immediately upon arrival at the booking counter. Tapia, in his deposition, admits that he "started getting arrogant" with the booking officers because he was angry. Tapia admitted that he told the officers to "shut up" and said "you guys are going to respect me" and that he "made more money than all of you guys," and other similar statements. The videotapes show that Tapia took his hands off the counter, while the pat-down search was still going on. While Officer Garcia was standing behind Tapia trying to perform a pat-down search, Tapia suddenly pushed backward from the counter towards Garcia. Garcia, in response, pushed Tapia forward and held him face down on the counter. Video 2 depicts Officer Thomas holding Tapia's head down on the counter during the pat down.

In the meantime, Officer Pinon got a set of leg irons, and he and another officer placed the leg irons on Tapia. Once the leg irons were secured and the pat down search completed, Garcia and Pinon led Tapia to a holding cell several feet away from the booking counter. While being escorted to cell, Tapia appeared to either trip, or "dropped his feet" (possibly caused by the leg irons), and Garcia and Pinon literally carried Tapia by his arms into the cell. Tapia's testimony was that the officers threw him onto the floor of the cell, called him a "Spic," and warned him "not to ever talk that way again." Garcia and Pinon in their depositions denied making any such comments, and stated that they placed Tapia on a bench in the cell and left. Video indicates that Garcia and Pinon were inside the cell for only a brief time, a matter of seconds only.

Tapia was later given a breathalyzer test and permitted to talk with a counselor and make a telephone call. Also, Tapia was evaluated by a mental health worker, who determined that Tapia was no longer a suicide risk, and he was released about four hours after he had arrived at the BCDC.

As a result of these events, Tapia sustained some bruises on his neck and, according to Tapia, he was "sore" for two weeks. Although Tapia sought medical attention the day after the incident, his personal doctor did not recommend either x-ray or any other form of medical treatment.

The district court granted defendants' motion for summary judgment based

7

on qualified immunity on the ground that Tapia had not sustained his burden of showing that Garcia's and Pinon's actions constituted the use of "excessive force," either at the "booking counter" or in their escorting Tapia from the booking counter to his cell and placing him therein, as such is proscribed by the Fourth Amendment. In this regard, the district court spoke as follows:

> Defendant Garcia's use of force in this case began in the context of positioning Plaintiff for a pat down search while Plaintiff was lawfully detained in the intake area of BCDC. Given the uncertain, stressful nature of this environment, in combination with the admitted and observable behavior of Plaintiff that could reasonably (albeit mistakenly) be interpreted as an attempt to fight back or resist the search, the Court concludes that Defendant Garcia is entitled to qualified immunity with respect to the force he used in pushing Plaintiff's head onto the booking counter, securing plaintiff's hands, and holding Plaintiff in that position for approximately two minutes while Plaintiff was placed in handcuffs and leg irons.
>
> . . . . . . . . .
>
> "Finally, the Court concludes that Defendants Garcia and Pinon are both entitled to qualified immunity with respect to the force they used in moving Plaintiff from the booking counter and placing him in the holding cell. While it is possible that Plaintiff simply lost his footing by accident as the officers escorted him to the holding cell, the officers could reasonably (albeit mistakenly) have interpreted this behavior as an attempt at resistance. Further, the videotape evidence shows that, after he lost his footing, Plaintiff was carried into the holding cell by his arms in a manner that is analogous to the procedure employed in <u>Saucier</u>, 533 U.S. at 198. Recognizing that "'[n]ot every push or shove, even if it may later seem unnecessary in the peace

8

> of a judge's chambers, violates the Fourth
> Amendment,'" the Supreme Court determined that
> officers utilizing this procedure in similar circumstances
> were entitled to qualified immunity. Id. at 209 (quoting
> Graham, 490 U.S. at 396). Accordingly, the Court
> reaches the same conclusion in this case."

*Gross v. Pirtle*, 245 F.3d 1151 (10th Cir. 2001) sheds light on the present controversy. In that case we acknowledged that 42 U.S.C. § 1983 provides an "important remedy for individuals injured by governmental officials' abuse of authority." *Id.* at 1155. At the same time, we also recognized that "such actions sometimes subject officials to costly and harassing litigation and potentially inhibit officials in performing their official duties." *Id.* In order to "balance" the two, we stated that "courts recognize the affirmative defense of qualified immunity, which protects all but the plainly incompetent, or those who knowingly violate the law." We also stated therein that the "Supreme Court has emphasized the broad protection qualified immunity affords, giving officials a right, not merely to avoid standing trial, but also to avoid the burdens of such pretrial matters as discovery." *Id.*

Having said that by way of background, we went on to say in *Gross* that our review of either the denial or granting of summary judgment is *de novo.* We then declared that we review a summary judgment order based on qualified immunity "differently from other summary judgment decisions," and that when a defendant

in a 1983 action raises the defense of qualified immunity, the "burden" shifts to the plaintiff, explaining that there is then a "heavy two-part burden" on the plaintiff to show: (1) that the "defendants' actions violated a constitutional or statutory right of the plaintiff, and (2) that the right "was clearly established at the time of the defendant's conduct." *Id.* at 1155 - 56. As indicated, the district court in the instant case granted summary judgment on the first ground, i.e., in booking Tapia into the BCDC and placing him in a cell for a few hours because of his suicidal tendencies and actions, the defendants did not violate plaintiff's constitutional right to be free of excessive force. To the same effect, see, for example, *Scull v. New Mexico,* 236 F.3d 588 (10th Cir. 2000) and *Latta v. Keryte,* 118 F.3d 693 (10th Cir. 1997).

In *Graham v. Connor,* 490 U.S. 386 (1989) the Supreme Court stated that the "'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight when there is a claim of 'excessive force.'" *Id.* at 396. The Court also stated that "not very push or shove, even if it may later seem unnecessary in the peace of a judge's chambers . . . violates the Fourth Amendment." In this regard, see also *Saucier v. Katz,* 533 U.S. 194 (2001), where the police officers removed a protester from a public function by "half-walking, half-dragging him, 'with his feet barely touching the ground'." *Id.* at 198.

10

The district court in the instant case issued a detailed order, setting forth at length her evaluation of the record before her, and concluded that Tapia had failed to show that the defendants' actions were objectively "excessive" and therefore "unreasonable" under the Fourth Amendment. We agree. Our conclusion is supported by the fact that Tapia's injuries were *de minimis*. *See Saucier* at 209. This is not the case of "excessive force" coming "out of the blue," so to speak. At the very outset, Tapia verbally confronted the defendants and pulled back from the booking counter while they were trying to frisk him to determine whether he had any weapons concealed on his person. In short, we believe that this case is controlled by the principle of *Graham* and *Saucier* that "not every push or shove . . . violates the Fourth Amendment." We agree with the district court that any "push or shove" in the instant case did not violate the Fourth Amendment.

Additionally, Tapia in his brief asked, in the alternative, that we remand the case to the district court with directions that it allow Tapia to further amend his complaint to add Officer Thomas as a party defendant, who allegedly "held down Tapia's head on the booking counter." At oral argument counsel withdrew this request, stating that they "could deal with that in another venue."

11

Judgment affirmed.

Entered for the Court


Robert H. McWilliams
Senior Circuit Judge